IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Crim. No. 07-149-1-SLR |
| | ) |
| NATHAN WEEKS, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM ORDER**

**I. INTRODUCTION**

On November 6, 2007, a federal grand jury issued an indictment and notice of

forfeiture against defendant Nathan Weeks[1] charging him with: (1) knowing distribution

of 500 grams or more of a mixture and substance containing a detectable amount of

cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); (2) knowing

possession with intent to distribute 500 grams or more of a mixture and substance

containing a detectable amount of cocaine, in violation 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(B); (3) knowing possession with intent to distribute 5 kilograms or more of a

mixture or substance containing a detectable amount of cocaine, in violation of 21

U.S.C. §§ 841(a)(1) and 841(b)(1)(A); and (4) knowing possession of a firearm by a

person prohibited, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (D.I. 1)

---

[1]Also charged by the same indictment were Antoine West, Andreus Scarborough
and Darnell Morris (collectively, "co-defendants"). (D.I. 1)

The charges emanate from evidence obtained pursuant to an undercover investigation by the Dover Police Department ("DPD"), as well as the subsequent execution of several search warrants in August 2007. Defendant filed an omnibus motion seeking: (1) to suppress electronic eavesdropping evidence; (2) a hearing on the audibility of tape recordings; (3) to compel the government to transcribe and categorize intercepted communications; (4) production of the government's exhibit list, witness list, expert testimony and notice of R. 404(b) evidence; (5) evidence under *Brady*; (6) joinder with his co-defendants' motions;[2] and (7) suppression of evidence obtained during searches conducted on: (a) a 2001 Chevrolet Tahoe ("Tahoe"); (b) 1108 Peachtree Run ("the residence"), Dover Delaware; (c) a 2001 Chevrolet Impala ("Impala"); (d) 73 Greentree Drive, #303, Dover, Delaware; (e) Air Base Mini Storage, Unit A-12; and (f) St. Jones Mini Storage, Unit 218. (D.I. 107) An evidentiary hearing was held on August 28, 2008.[3] (D.I. 155) After granting defendant's request for

---

[2] This motion is moot considering that the co-defendants have entered pleas of guilty.

[3] Testifying on behalf of plaintiff were DPD detective Jason Piers ("Piers"), DPD corporal Anthony DiGirolomo ("DiGirolomo"), DPD sergeant David Boney ("Boney"), and DPD officer Aaron James Dickinson ("Dickinson"). (D.I. 155) The court finds their testimony credible. *United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993) (the court is charged with reviewing the "credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence."); *Government of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir.1974).

2

additional time, the matter is now fully briefed.[4] (D.I. 107, 108, 114, 115, 144, 148, 151, 154, ) The court has jurisdiction pursuant to 18 U.S.C. § 3231.

## II. FINDINGS OF FACTS

1. In August 2007, a confidential informant ("CI") informed Piers[5] about defendant's role as a multi-kilo drug dealer in the Dover, Delaware area. (D.I. 155 at 11-12) The CI had previously purchased drugs from defendant. (*Id.* at 11) He indicated that defendant lived in the Woodside area and owned a gold Impala that was utilized in his drug dealings. The CI said defendant usually packaged and delivered cocaine inside a "Tide" laundry detergent box, with about two kilos concealed inside each laundry box. (*Id.* at 12)

2. Piers was familiar with the CI, although he had never worked with him before August 2007, and had no experience with the CI's reliability or credibility. (*Id.* at 42-43) Piers did not run a background investigation on the CI or independently investigate the information provided . (*Id.* at 43) Piers knew the CI had an arrest record, including a drug conviction for which he was incarcerated for eight years. (*Id.* at 43-44) The CI agreed to work for DPD in exchange for the possibility of reducing the prison sentence given his brother, a state inmate. (*Id.* at 39, 44) During a meeting that occurred on an unspecified date, Piers, along with the CI, a defense attorney and a

---

[4]The parties have agreed that all issues, except for the search of the Tahoe and Peachtree, may be decided on the papers submitted without reference to the facts evinced at the evidentiary hearing. (D.I. 148)

[5]Piers has been a police officer for 13 years. (D.I. 155 at 10) In addition to being a detective, Piers also serves as a section leader with the Drugs, Vice and Organized Crime Unit. (*Id.* at 9)

3

state prosecutor discussed whether the Cl's information could help to reduce his brother's prison sentence. (*Id.* at 44-45) The prosecutor advised that, if the Cl could "produce" then it might help to reduce his brother's sentence; however, no promises or guarantees were made. (*Id.* at 45)

3. The Cl advised that he had brokered a drug deal between defendant and two others.[6] (*Id.* at 10, 50-51) Specifically, the Cl explained that defendant agreed to supply two kilos of cocaine to "Ant" and "his cousin" on the evening of August 8, 2007 at TGI Friday's parking lot ("parking lot"), Dover, Delaware. (*Id.* at 10, 11) As a result of this information, the DPD decided to initiate surveillance and to conduct a controlled drug delivery. (*Id.* at 10) Prior to the anticipated time of the drug transaction, DPD officers were stationed at various points in the parking lot. (*Id.* at 11) Dickinson[7] operated a video camera to capture audio and video recordings of the events in the parking lot. (*Id.* at 12-13, 78) The surveillance equipment was stationed on top of a surveillance platform. (*Id.* at 11)

4. Piers advised the Cl that the transaction and related events would be video and audio recorded. (*Id.* at 11) The Cl consented to the recording and agreed to wear the transmitter recorder provided by Piers. (*Id.* at 12) Prior to leaving for the

---

[6]Because the findings of fact are based on the evidence and testimony presented at the hearing, information known to the court through separate documents or hearings concerning the co-defendants is not imputed to this defendant. Accordingly, these individuals are presumed to be the co-defendants. (*Id.* at 10)

[7]Dickinson has been a police officer for 13 years. He used a zoom lens and the video camera with a zoom lens wired into the transmitter to record the voices and sounds from the transmitter. (*Id.* at 98) Dickinson was able to hear, in real time, the parties' conversations. (*Id.* at 99)

4

designated location for the drug deal, Piers searched the CI with negative results. Piers, along with another detective, then followed the CI to the parking lot. (*Id.* at 11)

   5.   At approximately 8:45 p.m., Ant and his cousins arrived at the parking lot. (*Id.* at 13, 45) They got into the CI's car and gave him the purchase money. The CI took the money, walked over to the Tahoe, got into the front passenger seat, handed the money to the driver[8] and, in exchange, received a "Tide" laundry detergent box. (*Id.* at 13, 49) The CI, carrying the laundry box, returned to the car and gave the box to the buyers. (*Id.* at 14) The Tahoe then drive out of the parking lot. (GX1) DPD officers immediately converged on the car. A "Tide" laundry box containing 2,000 grams of cocaine, two kilos, was recovered at the scene. (*Id.* at 15) Three men were arrested, co-defendants Scarborough, West, Morris. (*Id.* at 47)

   6.   Later that day, the CI, while in a DPD interview room with audio and video recording activated, telephoned defendant to request that he count the money given during the drug deal because the CI believed he had overpaid defendant. (*Id.* at 15) Defendant said he would check and call back. Defendant telephoned the CI's cell phone and confirmed that the CI had overpaid by $3,000.00[9] (*Id.* at 16) Defendant and the CI arranged a meeting for later that evening at Applebee's restaurant ("the restaurant"), Camden, Delaware, for defendant to return the $3,000.00. (*Id.* at 19-20)

   7.   Prior to the meeting time, DPD officers set-up surveillance in the area around the restaurant. (*Id.* at 20) Piers, in uncover clothing, rode with the CI to the

---

   [8]Identified as defendant. (*Id.* at 14)

   [9]The CI activated the speaker phone feature on his cell phone in order for a DPD officer to hear the conversation. (GX2)

5

restaurant. (*Id.* at 20-21)  Piers and the CI entered an adjacent store to await defendant's arrival.  When DPD officers spotted the Tahoe, they notified Piers. (*Id.* at 21)  Defendant called the CI, indicating he was parked outside the store. (*Id.* at 21)  Piers and the CI left the store and spotted the Tahoe. (*Id.*)  Defendant was in the driver's seat, alone in the Tahoe.  When the CI approached the driver's side of the Tahoe, defendant handed him $3,000.00 and then drove the Tahoe away. (*Id.* at 22)

8.    DPD officers initiated a pursuit of the Tahoe. (*Id.* at 23)  Within minutes, the CI received a telephone call from defendant wherein defendant asked whether the CI had set him up because five to six police cars were following the Tahoe. (*Id.* at 24)  The CI offered to help defendant, however, the call ended abruptly. (*Id.* at 24)  Piers and the CI left the area quickly to avoid compromising the investigation as it was unclear whether defendant had made any other calls about the police pursuit. (*Id.* at 26-27)

9.    DPD officers eventually stopped the Tahoe and defendant was taken into custody on drug charges. (*Id.* at 25)  The Tahoe was not searched at the scene in order to prevent a compromise of the investigation. (*Id.* at 27)  Moving the Tahoe away quickly from the scene increased the DPD's chances of preventing anyone else from finding out about the arrest and the investigation could continue covertly. (*Id.* at 27)  To that end, a police officer drove the Tahoe to the DPD station, about ten minutes away. (*Id.* at 25, 26, 53)

6

10.     Before searching the Tahoe at the DPD station, a warrant was not obtained. (*Id.* at 53) Boney[10] searched the entire Tahoe and located recent utility and cable bills[11] inside a pouch behind the driver's seat. (*Id.* at 28, 90-93; GX10, GX11) The bills were addressed to defendant at the Peachtree location, 1108 Peachtree Run, Magnolia, Delaware. (*Id.* at 28-29, 94) Based on the information inferred from the recovered bills, Piers sent DPD officers DiGirolomo[12] and Baumgartner to Peachtree in order to "knock and talk" to the resident. (*Id.* at 30) Piers was unaware of whom resided at Peachtree. (*Id.*)

11.     Upon arriving at Peachtree, the officers had difficulty identifying the residence because the area was poorly lit and very dark. (*Id.* at 72) The residence, a trailer, was set far back from the road. (*Id.* at 72) Parked in the front yard was the Impala. (*Id.* at 72) Because it was very dark, the officers were unable to determine whether anyone was inside the Impala. DiGirolomo shined his flashlight into the Impala and saw, in plain view, a thick stack of money. (*Id.* at 72-73, GX12) They left the money undisturbed and approached the residence. (*Id.* at 74)

12.     It was quiet as they approached the residence, with little noise coming from inside. (*Id.* at 75) After DiGirolomo knocked and identified himself as a DPD officer, however, he heard rustling and running sounds from inside the residence. (*Id.*

---

[10]Boney, a sergeant, has been a police officer for 21 years. (*Id.* at 90)

[11]The Comcast cable bill had a due date of August 15, 2007, approximately one week after defendant's arrest. (*Id.* at 29)

[12]DiGirolomo is a Master Sergeant and supervisor assigned to Operation Safe Street, part of the Dover Police Drug Unit. (*Id.* at 71)

7

at 75, 77) After a few minutes of knocking, Lakeisha Tolson ("Tolson")[13] opened the door. (*Id.* at 76) DiGirolomo advised that they were there as part of a drug investigation and that defendant was in police custody. (*Id.* at 76) Tolson indicated that defendant lived there and then stepped outside and closed the door to the residence. (*Id.* at 76)

13. After speaking with the officers for a few minutes, Tolson returned inside the residence; DiGirolomo called Piers to apprise him of the situation. (*Id.* at 32, 77) DiGirolomo was concerned that evidence might be compromised. Specifically, because the residence was initially quiet and changed dramatically after his knocking and identification as a police officer, DiGirolomo thought that evidence might be destroyed. DiGirolomo also told Piers about the stack of money inside the Impala. DiGirolomo thought that waiting for a daytime search warrant would allow time for evidence to be compromised. (*Id.* at 32, 68, 77)

14. Piers told DiGirolomo to "hold the residence"[14] until officers could arrive with a nighttime search warrant. (*Id.* at 78) DiGirolomo knocked on the door, advised Tolson of what was happening and asked to enter the residence. (*Id.* at 78) Upon entering, DiGirolomo observed defendant's father seated on a couch and explained the situation to him. (*Id.* at 78-79) DiGirolomo also saw children in a back room playing video games. (*Id.* at 79)

---

[13]Identified as defendant's girlfriend. (*Id.* at 85)

[14]According to DiGirolomo, this meant "they were to enter the residence, do a safety sweep, not search anything, and a search warrant would be prepared for the residence." (*Id.* at 78)

8

15. For officer safety, DiGirolomo performed a security sweep of the residence. (*Id.* at 79-80, 63) The officers wanted to determine whether anyone else, potentially dangerous, was in the residence as they awaited the warrant. Because DiGirolomo did not want to alarm the children, the sweep was conducted in a "more relaxed" manner. (*Id.* at 80) Consistent with standard procedure, DiGirolomo and Baumgartner looked through all the rooms and inside the closets. (*Id.* at 63, 83, 89) There was no searching beyond the cursory surveying of each room. (*Id.* at 81) No one was found hiding in the residence. The officers waited inside the residence until the warrant arrived, sometime after midnight. (*Id.* at 31, 80 -82)

16. A nighttime search, pursuant to a search warrant, was conducted at the residence and the Impala. (GX3) Officers found $10,070.00, a loaded firearm and a small amount of marijuana inside the residence. (*Id.* at 63) Inside the Impala, officers discovered $5,000.00 lying in plain view on the front seat. (*Id.* at 61, 64-65, 69)

## III. CONCLUSIONS OF LAW

### A. Search of the Tahoe

1. Defendant contends that the search of the Tahoe does not fall within the automobile exception to the warrant requirement. (D.I. 148) Because the Tahoe was already secured and defendant was under arrest, the officers were obligated to procure a warrant before conducting the search. The utility bills were not subject to seizure, argues defendant, because they were neither contraband nor evidence of a crime and "did not give rise to probable cause to obtain other warrants." (D.I. 148 at 2)

2. Subject to limited exceptions, the Fourth Amendment's prohibition against "unreasonable searches and seizures" requires that officials obtain a search warrant

9

before searching persons or property. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Warrantless searches are presumptively unreasonable and the burden is on the government to establish, by a preponderance of the evidence, that the circumstances justified acting without a warrant. *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005).

3.      Police may search the entirety of a vehicle without a warrant if probable cause exists to believe it contains contraband. *Maryland v. Dyson*, 527 U.S. 465, 467 (1999); *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002). This principle has been extended to permit the search of any container located in a vehicle if the suspected contraband or evidence might be hidden in said container. *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999); *United States v. Salmon*, 944 F.2d 1106, 1123 (3d Cir. 1991). Probable cause is a fluid concept that exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 231, 238 (1983).

4.      Based on the circumstances of this case, the court concludes that the warrantless search of the Tahoe was valid under the automobile exception to the Fourth Amendment's warrant requirement. Specifically, the Tahoe was searched only minutes after arriving at the DPD station and after it had been stopped in connection with defendant's involvement with the drug transaction in the parking lot and later with the CI when the money was refunded. The utility bills were found within plain view during Boney's lawful search of the pouch inside the Tahoe. *Harris v. United States*, 390 U.S. 234, 236 (1968) ("objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into

10

evidence."); *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994). The utility bills demonstrate defendant's ownership of the Tahoe which was predominately featured at the drug transaction at the restaurant and later with the repayment of $3,000.00 to the CI. The utility bills further connect defendant and the Tahoe to the Peachtree residence.

## B. The Peachtree Search

5.      Defendant asserts that the security sweep was improper because there was no probable cause to search defendant's home. Moreover, defendant avers that there was no reason to conduct a security search and officers were not justified in entering the premises without a warrant.

6.      The United States Supreme Court has concluded that when probable cause exists, police actions in "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal or evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Segura v. United States*, 468 U.S. 796, 810 (1984). The record clearly demonstrates that DiGirolomo reasonably feared that evidence might be destroyed and communicated this concern to Piers. Permission was given to conduct a security sweep to hold the residence until a nighttime warrant was obtained. The uncontradicted record reflects that the security search was limited to looking for individuals hiding in the residence and did not transform into a full blown search. Moreover, nothing observed by the offices was incorporated into the affidavit supporting probable cause for the search warrant.

## C. The Electronic Eavesdropping Evidence

11

7.    Defendant contends that the audio and video recordings were collected in violation of Title III and the Fourth Amendment. (D.I. 107)  Defendant contends he had an expectation of privacy in the conversations he had in the Tahoe, therefore, intercepting the conversations violated his Fourth Amendment rights.

8.    Title III of the Crime Control Act provides "for an exception to the prohibition against the use of the contents of electronically recorded conversations where a party to the conversation has given consent prior to the recording." *United States v. West*, 312 F. Supp.2d 605, 616 (D. Del. 2004).  Courts have found no violation of Title III or the Fourth Amendment where, as the facts at bar demonstrate, a CI participates and records a conversation without a warrant. *United States v. Lee*, 359 F.3d 194, 201-203 (3d Cir. 2004); *United States v. Kelly*, 708 F.2d 121, 124 (3d Cir. 1983) (no constitutional or statutory violation to use in criminal case recordings of defendant when other party to conversation consented to the recording).  The record abundantly supports a finding that the CI consented to the making of the recordings of the phone calls and meetings at issue.

9.    With respect to video surveillance, the issue becomes whether defendant has demonstrated a legitimate expectation of privacy in the invaded place. *Minnesota v. Olson,* 495 U.S. 91, 95 (1990)  The record reflects that defendant was sitting in his vehicle in a public parking lot when videotaped and, therefore, cannot be said to have a legitimate expectation of privacy. *See generally, Katz v. United States*, 389 U.S. 347, 351 (1967).

**D. Hearing on Audibility of Recorded Conversations**

12

10. Defendant argues that the court should conduct a hearing to determine the audibility of the recordings at issue. He, however, has not challenged specific portions of the recordings on which a hearing would be merited.

11. The United States Court of Appeals for the Third Circuit has concluded that, when a defendant makes a "colorable attack" on the authenticity and accuracy of a tape recording, the burden is on the government to produce clear and convincing evidence as to the authenticity and accuracy of the recording prior to its admission at trial. To that end, the government must establish a foundation by establishing the following facts:

(1) That the recording device was capable of taking the conversation now offered in evidence; (2) That the operator of the device was competent to operate the device; (3) That the recording is authentic and correct; (4) That changes, additions or deletions have not been made in the recording; (5) That the recording had been preserved in a manner that is shown to the court; (6) That the speakers are identified; and (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*United States v. Starks*, 515 F.2d 112, 121 n.11 (3d Cir. 1975).

12. Considering that defendant has presented nothing more than a request for hearing, the court finds that a "colorable attack" has not been demonstrated and, accordingly, a *Starks* hearing is unwarranted.

## E. Transcription of Audio Recordings

13. Defendant asserts the government should be compelled to "transcribe all intercepted communications, verbatim, and identify those which it intends to offer into evidence, and indicate which communications it deems to be either inculpatory or exculpatory." (D.I. 107 at 13) The government resists providing the transcripts any earlier than a week before trial.

13

14. At this juncture in the proceedings, the court finds it unnecessary to compel transcription any earlier than the pretrial conference, typically scheduled seven to ten days before the commencement of trial. This issue, however, will be revisited if problems result.

## F. Defendant's Discovery Requests

15. Defendant moves for: (1) the production of the government's witness and exhibit lists; (2) the list of unindicted co-conspirators; (3) a summary of expert testimony; (4) early disclosure of R. 404(b) evidence; and (5) *Brady* material divided into generic categories. Since defendant's motion and the government's response were filed in May 2007, it is unclear whether the government has since fulfilled its discovery obligations. The parties should be prepared to discuss the status of defendant's discovery requests at the telephone conference, noted at the end of this order.

## G. Search Warrants

16. Defendant challenges the six search warrants issued as lacking probable cause and containing insufficient information linking defendant to the item searched.

(D.I. 108)

17. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. The threshold requirement for issuance of a warrant is probable cause. *Illinois v. Gates*, 462 U.S. 214, 236. In reviewing a search warrant

application, a judge must consider whether, considering all of the circumstances described in the affidavit, sufficient evidence has been presented that demonstrates that there is a "fair probability" that evidence of a crime will be located before validating a warrant. *Gates,* 462 U.S. at 238; *United States v. Ritter*, 416 F.3d 256, 262-63 (3d Cir. 2005). Probable cause is a "fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232.

18.    After a search warrant has been issued and is challenged on the basis of probable cause, the reviewing court must determine whether the judicial officer had a "substantial basis" for finding probable cause. *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001); *United States v. Ritter*, 416 F.3d 256, 264 (3d Cir. 2005). The decision of the issuing officer should be afforded great deference. *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002); *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993). The reviewing court does not conduct a *de novo* review and should avoid "interpreting affidavits in a hyper-technical, rather than a common sense manner." *Gates*, 462 U.S. at 236 (quoting *United States v. Ventresca,* 380 U.S. 102, 109 (1965)). In so doing, the court must confine itself to only the affidavit and cannot consider other portions of the record. *Hodge*, 246 F.3d at 305. When resolving questionable cases, the deference accorded warrants should prevail. *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993).

19.    "Direct evidence linking the residence [to be searched] to a criminal activity is not required to establish probable cause" for a search warrant. *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002); *United States v. Whitner*, 219 F.3d 289, 297

(3d Cir. 2000). "[A]n accumulation of circumstantial evidence" can be sufficient to

establish a fair probability that evidence of criminal activity is present at a residence.

*Burton*, 288 F.3d at 103. With regard to drug cases, the Third Circuit has explained:

> [E]vidence associated with drug dealing needs to be stored somewhere,
> and . . . a dealer will have the opportunity to conceal it in his home. After
> all, a dealer logically could conclude that his residence is the best, and
> probably the only, location to store items such as records of illicit
> activity, phone books, address books, large amounts of cash, assets
> purchased with the proceeds of drug transactions, guns to protect drugs
> and cash, and large quantities of drugs to be sold.

*Whitner*, 219 F.3d 289, 298.

### 1. Affidavit in support of Peachtree and the Impala

20. Considering this authority in light of the affidavit in support of the searches

of Peachtree and the Impala, the court concludes that the affidavit contained an

accurate, relevant and detailed information. Specifically, the affidavit contains facts

detailing the information provided by the CI about defendant and sets forth the facts

surrounding the drug transaction at the restaurant. (D.I. 114-2) The overpayment and

meeting with the CI are described. The discovery of the utility bills linking defendant to

Peachtree and the officers' observations at the residence are outlined. The facts are

analyzed against the affiants' experiences with drug dealers and transactions, resulting

in the conclusion that a nighttime search warrant was mandated. Based on the

deference afforded, the court finds probable cause evident.

### 2. Affidavit in support of Air Base Mini Storage Unit A-12

21. The affidavit in support of this search set forth the background information

described in the affidavit in support of the Peachtree and Impala searches, as well as

the evidence recovered during those searches. Significantly, the affidavit detailed an

16

anonymous tip that defendant owned a Lexus and a mini storage unit somewhere in Dover, Delaware. (D.I. 114-2 at 15) The tip was corroborated by a DPD investigation that revealed a mini storage unit located at Air Base Mini Storage, Dover, Delaware was leased to defendant. Considering this information in light of Whitner, there was sufficient probable cause to believe that evidence of defendant's drug dealings would be found in the storage unit.

### 3. St. Jones Mini Storage, Unit 218

22.     The affidavit in support of this search warrant details the same background information as the previously discussed warrants, but additionally recites the results of the search at the Air Base Mini Storage Unit. Particularly, inside the storage unit, police officers found: (1) approximately 549.3 grams of cocaine; (2) a Lexus registered to defendant; (3) a receipt from St. Jones Mini Storage Unit under defendant's name. (D.I. 114-2 at 23) Accordingly, there was sufficient probable cause to believe that evidence of defendant's drug dealings would be found in this second storage unit.

### 4. Second Peachtree Search

23.     Following the search at the St. Jones Mini Storage Unit and approximately four days after the first search on Peachtree, officers requested another search warrant for documentary evidence. This affidavit set forth with copious detail the background, investigation, drug transaction at the restaurant and subsequent searches and results. (D.I. 114-2 at 31-35) Included also were the results of the DPD's investigation of defendant that revealed evidence of an extensive drug dealing operation including evidence of multiple vehicles owned by defendant and cash proceeds. To that end,

17

there was probable cause to support the warrant for additional evidence at Peachtree.

### 5. 73 Greentree Drive #303

24. In addition to the information detailed in the previously discussed affidavits, this affidavit explained that: (1) documents recovered from Peachtree were addressed to defendant at this address; (2) the Impala was registered to defendant at this address; (3) the Air Base Storage Unit was leased to defendant at this address; (4) defendant is listed in Delaware Criminal Justice Information System ("DELJIS") at this address; (5) mail found at the St. Jones Mini Storage Unit was for defendant at this address; and (6) a subpoena served on UPS revealed that box #303 was leased to defendant. These facts demonstrate a substantial basis for a finding of probable cause.

### 6. Good Faith Reliance

25. Alternatively, even if the court concluded that the issuing court did not have a substantial basis for finding probable cause, that fact alone is insufficient to mandate the "extreme sanction of exclusion." *United States v. Leon*, 468 U.S. 897, 926 (1984). The good faith exception to the exclusionary rule "instructs that suppression of evidence 'is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority' even though no probable cause to search exists." *Zimmerman*, 277 F.3d at 436 (quoting *Hodge*, 246 F.3d at 307). The Supreme Court's "evaluation of the costs and benefits of suppressing reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral" judge compels the decision that such evidence should be admissible. *Leon*, 468 U.S. at 913. The Supreme Court has held that a "warrant issued by a [judge] normally suffices to

18

establish that a law enforcement officer has acted in good faith in conducting the

search." *Id.* at 922.

26.    The Third Circuit has identified four situations where an "officer's reliance

on a warrant would not be reasonable and would not trigger" the good faith exception:

> (1) Where the [judge] issued the warrant in reliance on a deliberately or
> recklessly false affidavit; (2) Where the [judge] abandoned his or her
> judicial role and failed to perform his or her neutral and detached function;
> (3) Where the warrant was based on an affidavit so lacking in indicia of
> probable cause as to render official belief in its existence entirely
> unreasonable; or (4) Where the warrant was so facially deficient that it
> failed to particularize the place to be searched or the things to be seized.

*Zimmerman*, 277 F.3d at 436-37.

27.    Considering each affidavit against *Leon* and its progeny, it was objectively

reasonable for the officers to rely on the issuing court's determination that probable

cause existed.

## IV. CONCLUSION

At Wilmington this $\mathcal{26}^{th}$ day of January, 2008,

IT IS ORDERED that:

1. Defendant's omnibus motions are denied.  (D.I. 65, 107, 148)

2. A telephonic status conference is scheduled for **Thursday, February 5, 2009**

at **11:00 a.m.**, with the court initiating said call.

19

3.  The time between this order and the telephone conference shall be excluded under the Speedy Trial Act in the interest of justice.  18 U.S.C. § 3161(h)(8)(A).


United States District Judge

20